IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 27, 2019

**STATE OF TENNESSEE v. ERIC FOSTER**

**Appeal from the Criminal Court for Knox County**
**No. 110008     Steven W. Sword, Judge**

_____

**No. E2018-01205-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, Eric Foster, as charged of one count of aggravated rape, two counts of rape, one count of statutory rape, and one count of exhibition of harmful material to a minor. See T.C.A. §§ 39-13-502, 39-13-503(a)(2), 39-13-503(a)(3), 39-13-506(b)(2), 39-17-911(a)(1). The trial court merged the two rape convictions with the aggravated rape conviction before sentencing the Defendant to an effective sentence of fifteen years. On appeal, the Defendant argues (1) the trial court erred in denying his motion in limine to exclude his oral and written statements to police, and (2) the evidence is insufficient to sustain his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee (on motion for new trial and appeal) and Rhonda Lee, Powell, Tennessee (at trial) for the Appellant, Eric Foster.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Nate Ogle, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns the Defendant's aggravated rape of T.G.,[1] the fifteen-year-old victim. In light of the acts committed during this incident, the Defendant was charged by presentment with one count of aggravated rape, two counts of rape, one count of statutory

_____

[1] It is the policy of this court to identify minor victims of sexual abuse by their initials. In this case, we will also identify the minor victim's father by his initials in order to protect the victim's identity.

rape, and one count of exhibition of harmful material to a minor. The day of trial, the Defendant filed a Motion in Limine to Exclude Any Oral or Written Statements By Defendant, arguing that his statements should be suppressed because he was not given any waiver of rights and was denied his constitutional rights under Miranda.

**Motion in Limine.** Immediately prior to the start of trial, the trial court allowed a hearing on the Defendant's late-filed motion in limine to exclude his oral and written statements.[2] In support of this motion, the defense argued that the Defendant's statements should be suppressed because he was not given the appropriate Miranda warnings prior to providing these statements.

At the motion hearing, Detective Grayson Fritts of the Knox County Sheriff's Department testified that he interviewed the Defendant on February 8, 2016, which was approximately two weeks after the incident in this case. He said he and Detective Allen Merritt went to the home where this incident occurred and spoke with Amber West and the Defendant, who were suspects in the investigation. Before speaking with them, Detective Fritts advised West and the Defendant that they were not in custody, that he had no warrants for their arrest, and that he wanted to talk to them about what happened. West and the Defendant agreed to speak with him. Detective Fritts said that he first interviewed West in his unmarked vehicle, which did not have any caging between the first and second row of seats. He said that West sat in the front passenger seat of his vehicle and that Detective Merritt sat in the backseat. During this interview, West provided a statement, which Detective Fritts recorded. At the conclusion of this interview, West returned to her home.

Next, Detective Fritts spoke with the Defendant, who also sat in the front passenger seat of his unmarked vehicle while Detective Merritt sat in the backseat. Detective Fritts said that the Defendant was not locked inside his vehicle and could have exited the vehicle at any point if he desired. He told the Defendant that he had some questions for him but never informed the Defendant that he had to give a statement. Detective Fritts said that he never threatened the Defendant and that the Defendant was not wearing handcuffs during the interview. He also said the Defendant never indicated that he felt threatened or intimidated. During this interview, the Defendant provided a statement, which Detective Fritts recorded, and this statement was admitted into evidence at the motion hearing.

---

[2] Although the Defendant did not file a timely motion to suppress, the trial court nevertheless permitted the defense to have a pre-trial hearing on its motion in limine to exclude the Defendant's oral and written statements to police.

In his February 8, 2016 recorded statement, the Defendant said that two weeks earlier, the victim had come over around sunset to the home he shared with West and West's fiancé. He said that West, who did not know that the victim was underage, had invited the victim over. When the victim arrived, the Defendant said "Hi" to her but did not talk with her further. The Defendant said he left the home to walk around the neighborhood right after the victim arrived and did not return until approximately 9:00 p.m. that night. When he returned, West told him that the victim had gotten sick from drinking too much alcohol and that she had given the victim a shower because she had vomited on her clothes. The Defendant said that the victim was lying down in the spare bedroom and that West was holding a trashcan for the victim while she vomited. He also heard West talking to the victim's mother on the phone. When he realized that the victim was vomiting, the Defendant went directly to his room. The Defendant said at some point prior to the victim coming over, West told him that the victim thought he was cute. The Defendant viewed the victim's Facebook page approximately one week before she came over and concluded that the victim was young after looking at the photographs she had posted. The Defendant specifically told Detective Fritts that he believed the victim was probably seventeen or eighteen years old, around West's age. The Defendant claimed he never contacted the victim or texted her prior to her coming over to the home and asserted that the victim had never made any reference to her age while communicating with him. When Detective Fritts asked him why the victim would claim he forcibly raped her, the Defendant replied that he had not had any physical contact with the victim, that they had not had sex, and that he did not know why the victim would make that claim. The Defendant also asserted that the victim had never seen him without his clothes on. During this recorded statement, Detective Fritts told the Defendant that there were no warrants for his arrest and that he was simply trying to uncover the truth. He also told the Defendant not to be worried because he and Detective Merritt would be leaving in a short while. At the end of his statement, the Defendant consented for law enforcement to collect a DNA sample from him.

Detective Fritts said that once he completed the interview with the Defendant, he, Detective Merritt, and the Defendant all exited the vehicle, and the Defendant returned to his home.

Detective Fritts said that on July 13, 2016, he visited the Defendant at Burger King, where the Defendant worked. When he first encountered the Defendant there, the Defendant "seemed fine." Detective Fritts said he never informed the Defendant that he was required to talk to him but did tell him that he wanted to talk to him about a few things. Detective Fritts said he again advised the Defendant that he was not under arrest and that there were no warrants pending for him. The Defendant willingly agreed to talk to him, and they walked outside at Detective Fritts' request. Once outside, the Defendant asked if he could smoke a cigarette, and Detective Fritts replied, "No problem." When

the Defendant finished smoking his cigarette, Detective Fritts asked if they could talk in his unmarked vehicle "for the sake of privacy," and the Defendant agreed and sat in the front passenger seat. Detective Fritts said that he also recorded this conversation and that the Defendant gave him a full statement regarding the allegations. This recorded statement was also admitted during the motion hearing.

During this July 13, 2016 recorded statement, the Defendant said the victim had contacted him via Facebook and had asked him to talk to West about inviting her over, and the Defendant told the victim she would have to talk to West about coming over herself. He claimed that the victim was interested in him, although he was not interested in her. While the Defendant initially claimed he did not have the Kik application on his cell phone and only sent photographs of his face to the victim in January 2016, he later admitted that he had sent nude photographs of himself to the victim over the Kik application and asserted that he thought the victim wanted to see them based on her earlier statements to him. The Defendant said that on the night of January 22, 2016, he, the victim, and West were all drinking, although he never provided alcohol to the victim. The Defendant and West warned the victim that she was drinking so much that she was going to get sick. At the time, the Defendant said he thought the victim was eighteen or nineteen years old. After they had been drinking for a while, the Defendant said West pushed him and the victim into her bedroom. Thereafter, the Defendant said that the victim gave him oral sex and that the victim kept pulling him closer, clawing his back, and kissing him. He said that he began having sex with the victim and that West put a large vibrator inside the victim's vagina. The Defendant said he was not wearing a condom and did not ejaculate while having sex with the victim because he was so intoxicated. He also said that he and the victim had their shirts on and pulled their pants down while having sex and that West had all her clothes on and put her hand inside her pants while he and the victim were having sex. After he and the victim had sex, the victim threw up, and he and West gave her a shower. He said West told him the victim later fell in the shower. The Defendant said he thought the victim was at least eighteen years old because the victim and West had attended church camp together. He claimed that neither he nor West knew the victim was fifteen until after they had sex and that the victim told West that she was underage just before she left the home. During the recorded interview, Detective Fritts asked the Defendant to write out, in his own words, a general statement of what they had just discussed, and the Defendant agreed to do this. The Defendant then said he was thirsty, so they exited the vehicle and walked inside the restaurant, where the Defendant got a drink before they sat down in a booth and the Defendant provided his written statement.

Detective Fritts testified that he did not threaten the Defendant with charges during the second interview. He also said he made it clear to the Defendant that he was not in custody and that he was free to leave. Based on the information disclosed during the

- 4 -

interview, Detective Fritts said that he told the Defendant that he would like for him to write out a statement and that the Defendant willingly and voluntarily provided a written statement that he signed and dated. Detective Fritts stated that the Defendant provided the following written statement during the second interview, which was admitted into evidence:

> I met [the victim] from [West]. They were friends at camp. I was told [the victim] liked me and so I messaged her and we talked and I sent her nude pics on Kik. She came over. We all drank [and] had sex with [West] there. She kept pulling me closer but I wanted to stop. [West] gave her a shower cause she threw up and fell in shower and told us before her mom came and got her that she was 15 when she told us both she was 18 when we started drinking. I lied to dete[ctiv]es cause I was scared to go to jail and [West] played with her vagina with a dildo and I had oral sex with her and vaginal [sex]. Didn't c[o]m[e]. Shirts was on pants just pulled down.

> I sent [the victim] nude penis pics in my room on Kik because the way she was talking I thought she wanted to see with my phone. It was Red or giraffe bedding.

Detective Fritts said that after providing this statement, the Defendant returned to work.

The Defendant also testified at the hearing. He stated that he first saw Detective Fritts on January 22, 2016, the same day that the incident with the victim occurred. While acknowledging that the recording indicated that his first interview with Detective Fritts took place on February 8, 2016, the Defendant nevertheless asserted that his first interview with Detective Fritts took place on January 22, 2016. On that day, the Defendant said West told him the police were there, and he came out of his room and saw the detectives standing inside his home. The detectives asked West to come outside to their "undercover car" and give a statement about what happened during the incident involving the victim. The Defendant acknowledged that West was not taken into custody after giving her statement and that the detectives did not tell them that they had outstanding arrest warrants. When West returned to the house, the detectives stood outside the door to the home and told him they needed to get his statement. The Defendant said he was nervous and scared that if he refused to provide a statement, he would be arrested.

The Defendant said he walked with the detectives to their car and sat in the backseat of their vehicle while the two detectives sat in the front seat. Although the Defendant acknowledged that he could have exited the vehicle at any time, he said he

was scared the detectives would arrest him if he left because they were trying to get a statement from him. While he acknowledged that Detective Fritts never told him he would be taken into custody if he did not provide a statement, the Defendant said, "[The detectives] kept on hounding me with questions, and I was just wanting to get out of the car." The Defendant admitted he was able to exit the vehicle at the end of the interview and that neither of the detectives tried to take him into custody. He said that he returned to his home and that the forensic unit collected DNA samples from him and West.

The Defendant said that the next time he saw Detective Fritts was on July 13, 2016, while he was working at Burger King. The cashier told him that there was a detective, with a badge and a gun, who wanted to speak with him. When he walked to the front, Detective Fritts said he probably knew why he was there to talk to him, and the Defendant replied, "Yes," and they walked outside. He said Detective Fritts did not tell him that he was under arrest or that he was required to talk to him. However, he asserted that Detective Fritts wanted him to come outside and give him a statement, and he agreed to speak with him. The Defendant asked if he could smoke, and after finishing his cigarette, he got into the undercover "cop car" at Detective Fritts' request and sat in the front passenger seat. Although he acknowledged having a choice as to whether he got into the vehicle, he said he was nervous that if he did not do what Detective Fritts asked, then he would be arrested.

The Defendant said he asked to get some water because he did not want to be in Detective Fritts' vehicle anymore, and he and Detective Fritts went back inside Burger King. When they went back inside the Burger King, Detective Fritts asked if he would be willing to provide a written statement, and he agreed to do so. Detective Fritts told him to put the statement in his "own words." The Defendant acknowledged that Detective Fritts did not take him into custody or arrest him during the interview on July 13, 2016.

At the conclusion of this hearing, the trial court orally denied the motion in limine, making the following findings of fact and conclusions of law, in pertinent part:

> The Court f[i]nd[s] Detective Fritts to be credible in his testimony. Listening to the tapes [of the statements given by the Defendant], [Detective Fritts'] demeanor seemed very much like it was here on the stand today, very nonconfrontational. At one point he even tells the [D]efendant that he's trying to disprove what she said as much as he's trying to prove it. He's just—his goal was to get to the truth, is what he said, and the entire conversation was quite friendly, it appeared, and very businesslike, and . . . both of them were very straightforward. The officers were not being accusatory. They were pretty short in length. The first one

was 37 minutes; the second one, 35 minutes. The first one occurred at the [D]efendant's house. Although it was outside in the officer's cruiser.

There was a difference of testimony of where exactly he sat, whether he was in the front seat or the back seat and also when it happened in relation to the events. The [D]efendant testified clearly that [the first interview] happened on January 22nd. The detective said it was a couple of weeks after the allegations, and the indictment says [the offenses occurred on] January 22nd.

So I listened to that first tape, and it says, while the [D]efendant is sitting in the car, it's February 8, 2016. The [D]efendant never says, "No, it's not February 8th. It's January 22nd." And then they start talking about things, and the first thing they talk about is when did this allegedly happen, and the [D]efendant said it was probably a couple of weeks ago.

And so if the [D]efendant is right and the tape is wrong, Detective Fritts is wrong, then the indictment has [a] real . . . problem 'cause [sic] it says January 22nd, 2016, is when this happened, and so at this point, I find that the [D]efendant's memory is not quite as credible as the detective['s], and I could be proven wrong . . . when the proof comes out, but according to that tape, it was pretty clear they're talking about something that happened two weeks before and that they said it was February 8th.

So the [D]efendant did not seem on either of the tapes like he felt that he was under any direct pressure. I certainly don't disbelieve him when he says he was nervous and worried about being arrested. That's a pretty logical and normal response that someone would have . . . in being interviewed by detectives about this type of thing, but you know, the first time there are only two detectives there. They were at his house. The second time they were at his work.

Both times they tell him there's no warrants for his arrest. They're just trying to get to the bottom of what did or did not happen, and so based upon the totality of the circumstances in this case, the Court does find that a reasonable person in the suspect's position would have not felt deprived of their freedom of movement to a degree associated with a formal arrest.

I don't even think it's close in this case. He not only was engaged in a conversation with the officers about what . . . did or did not happen. They weren't confronting him. They were just asking him so what about

- 7 -

this, and who did what, and they let him leave both times. . . . [T]he second time, he even gets out and gets a drink. The first time, he saw Amber West get interviewed first and walk out of the car, and then the same thing happens with him, and so . . . I don't think that this was a custodial interrogation, either one of them, and so I'm going to deny the motion and allow the [S]tate to introduce proof of the statements.

**Trial.** At trial, the victim testified that she was fifteen years old on January 22, 2016, the date that the offenses in this case occurred. She said she had attended church camp with Amber West, who was nineteen years old at the time of these offenses. On January 22, 2016, the victim talked to West, and they made plans for the victim to visit West at her home. They also communicated over Facebook Messenger, and the victim eventually became aware that West's fiancé, Michael, and the Defendant also resided at this home. The victim said she had never met or spoken with the Defendant before January 22, 2016.

Later that day, the victim said the Defendant contacted her on Facebook Messenger and told her that she was "cute," and the victim responded, "Lol thanks," and added a smiley face emoji. The victim said that she thanked the Defendant because he had called her cute but that she had no intention of hooking up with him. The victim then informed the Defendant that she was "a lil young" for him because West had told her that the Defendant was older, but the Defendant replied, "Nope lol," and continued to message her. The Defendant told her that she was "cute" again, and the victim replied, "Lol thanks your [sic] cute to [sic]." At the time, the victim was not concerned about an older guy flirting with her. The victim then told the Defendant to text her and provided her cell phone number, and the Defendant replied, "Ok," and gave her his cell phone number. The Defendant then told her, "ill [sic] be 23 on Saturday and I like young girls." He also told her she was "down right sexy," and the victim did not know what to think about that statement.

The victim said she later contacted the Defendant on his cell phone number, and they exchanged text messages. She said that the Defendant told her he wanted to have sex with her and that although this made her feel "[a] little uncomfortable" and nervous, she responded, "Yes, maybe." The victim explained that she gave this response because she did not want to make the Defendant upset and still wanted to go to West's home given that she had nothing to do that night. The victim stated that during their text messaging, she never told the Defendant her age, and the Defendant never asked her for her age.

The Defendant and the victim then exchanged additional messages on a cell phone application called Kik. The Defendant asked the victim to send him photographs of

herself, and the victim responded that she did not do that. The Defendant continued to pressure her about sending pictures of herself, stating, "One time, baby just one time for me since I'm hot lol." The victim avoided the issue and said she needed to speak with West because she was unsure her father would drive her over. Although the victim never asked for any photographs, the Defendant sent her nude photographs of himself revealing his penis, which made the victim feel "uncomfortable." The victim said she never sent the Defendant any photographs of herself. She explained that even after seeing the Defendant's nude photographs, she still wanted to go to West's home so she could "get away" from her house. The victim said that when she went to West's home, she did not intend to have sex with the Defendant.

The victim, who did not have her driver's license, asked her father to drive her to West's home. She did not disclose to her father that there were any men living there because he would not have allowed her to go. The victim said she intended to spend the night with West. When they arrived, West met them outside and talked with the victim's father. As she entered the home, the victim saw the Defendant, but he did not say anything to her. When the victim sat down on the couch in the living room, the Defendant sat down next to her. At the time, the victim thought it was "weird" that the Defendant had not said anything to her. The victim eventually stood up and went into the kitchen with West, who was pouring shots of "Jager" and "vodka" and handed them to her. The victim, who had never consumed alcohol before, began drinking these shots. Although she did not know how many shots she drank, she acknowledged that "[i]t was a lot." West was also taking shots, but the victim saw the Defendant consume only one drink, which he made himself.

The victim said that after taking several shots, she felt sick and dizzy. She returned to the living room and sat on the couch with the Defendant, although he continued to say nothing to her. West eventually came into the living room and brought "[m]ore shots" with her. Although the victim told her that she could not drink any more, West put the shot up to her face, and the victim drank it because she did not want to seem "uncool." The victim said she felt pressured to drink and could not remember how many additional shots she drank while she was in the living room. The victim got up and walked to West's bedroom, where she sat down on the bed. At that time, only West was in the room with her. The victim recalled lying down on West's bed and West sitting next to her before she "blacked out" and could not remember anything. The victim said she never told West or the Defendant that she wanted to have sex with them.

When the victim awoke, the Defendant was on top of her and her clothes had been removed, although she had not taken off her clothes and had not given anyone permission to take off her clothes. The victim said the Defendant was nude and was penetrating her vagina with his penis. The victim heard "a vibrating noise" that she believed was a

vibrator and recalled seeing West in the room. She also heard West's voice during the incident and heard West and the Defendant laughing together. The victim said she was in pain and remembered yelling, although she "blacked out again" a few minutes later.

When the victim awoke a second time, she was in a different bedroom and felt sick. Her hair was damp, she felt like she had been bathed, and she was wearing the change of clothes that she had brought with her. The victim said West was holding a trash can near her because she was vomiting, and the victim saw the Defendant standing in the hallway before he walked away. She said the Defendant did not say anything to her. West used the victim's cell phone to call the victim's father's girlfriend. At the time, the victim felt "sick" and "wanted to go home."

The victim denied taking the Defendant's pants off during the incident and denied giving the Defendant oral sex. She said she did not recall West taking off her pants during the incident or West giving her oral sex. The victim did not recall West touching her private parts with her fingers.

The victim said that when her father and his girlfriend arrived at West's home, West walked her out to their vehicle. The victim was "dizzy" and "couldn't really walk." The victim said she was scared to tell her father about what happened because she was afraid he would get mad about the Defendant being at West's home and about her drinking alcohol. After leaving West's home, the victim told her father the truth about what had happened because her vagina was hurting, and she needed medical care. The victim said her father called 9-1-1, and they pulled into a church parking lot to wait for the ambulance to arrive.

The victim said she was immediately taken to the East Tennessee Children's Hospital, where she underwent several tests and later talked to Detective Grayson Fritts. She said she told Detective Fritts the truth about what happened based on what she remembered. She did not recall telling Detective Fritts that West had touched her private parts while the Defendant kissed her and rubbed her all over. She also did not recall telling Detective Fritts that she was not surprised that something sexual happened when she went over to West's home. The victim explained that she was still intoxicated when she spoke with Detective Fritts at the hospital and was having a hard time remembering what had happened. However, she did recall telling Detective Fritts that West had a vibrator. She said she did not remember telling the Defendant, "[N]o."

While she was at the hospital, the victim noticed that the messages she had previously exchanged with the Defendant and West had been deleted, although the victim had not deleted them. The victim said she gave her cell phone to Detective Fritts and was

discharged from the Children's Hospital that night. At the time of her discharge from the hospital, she felt pain in her vagina when urinating.

The next day, January 23, 2016, the victim went to the University of Tennessee Medical Center, where Nurse Nan Arsenault performed a sexual assault examination on her. Nurse Arsenault informed her that she had sustained a vaginal tear that had to be repaired at the hospital, and this injury took two weeks to heal. She had two bruises on her breasts and a scratch on her chest. The victim stated that she never intended to have sexual intercourse with the Defendant when she went to the bedroom with West. She stated that she never gave the Defendant permission for him to place his penis inside her vagina and never gave permission to the Defendant or West to place anything inside her vagina the night of January 22, 2016. The victim said that if she could have stopped or prevented the Defendant from having sex with her, she would have. She identified the Defendant in the courtroom as the person who sexually penetrated her.

J.G., the victim's father, testified that he had never heard of West or the Defendant when the victim asked if she could spend the night with West. He asked the victim who West was and how the victim knew her. He eventually gave the victim permission to spend the night there once he was told that West's grandmother would also be home. He said that he did not know the victim would be drinking there and that the victim never told him the Defendant was also going to be at West's home. After dropping off the victim at West's home around 8:00 p.m., J.G. returned home.

J.G. said that around two hours later, he received a phone call from the victim's cell phone. When he answered it, a female voice, that did not belong to the victim, spoke to him. During this call, J.G. could hear the victim's voice in the background and knew that the victim did not sound like herself. He immediately drove to West's home, and when he pulled into the driveway, the victim and West exited the home, and the victim got into his truck. He said that the victim's voice was "shaky and distorted." When he noticed that the victim smelled of alcohol, could not sit upright, could not keep her eyes open, and had trouble talking, J.G. asked the victim what she had done. After the victim told him what had happened, he decided to call 9-1-1. He pulled over and waited for an ambulance to arrive.

Once the ambulance transported the victim to the Children's Hospital, J.G. was able to further observe the victim's behavior. He noted that although the victim was still under the influence of alcohol, she was beginning to improve and was having an easier time speaking. While at the Children's Hospital, J.G. allowed Detective Fritts to take the victim's cell phone.

Detective Fritts testified that when he arrived at the Children's Hospital in the early morning hours of January 23, 2016, he spoke to the victim. He said the victim looked "tired," and while she was "not full-blown intoxicated," he could smell that she had been drinking recently. Detective Fritts learned that the incident had taken place on the evening of January 22, 2016, and he collected the victim's cell phone. He said that the victim told him messages had been deleted from her phone and that she believed West had deleted them while she was intoxicated. Detective Fritts attempted to get a sexual assault nurse to examine the victim while she was at the Children's Hospital but because of the snow that had just fallen, no one was available, and the victim was not examined by a sexual assault nurse until the next day. Detective Fritts said that he also arranged for the victim to be interviewed at Child Help by a child forensic interviewer. He stated that based on the interview of the victim performed by Child Help, he began investigating this case.

Detective Fritts said that on the evening of February 8, 2016, he and Detective Allen Merritt visited West's home. They rode there in an unmarked car, and when they knocked on the front door, either West or the Defendant answered the door. Detective Fritts said that they first interviewed West, while the Defendant remained in the house. He interviewed West in his unmarked vehicle, with West sitting in the front passenger seat. Detective Fritts advised West that he wanted to get her side of the story. He told her that she was not under arrest and that there were no outstanding warrants for her. He also said that West was free to leave at the conclusion of the interview.

Detective Fritts said he and Detective Merritt next interviewed the Defendant and that he recorded this interview. Detective Fritts advised the Defendant that he wanted to get to the truth and told the Defendant that he was not under arrest and that there were no warrants for his arrest. Detective Fritts said the Defendant was never placed in handcuffs. He said the Defendant sat in the front passenger seat of his unmarked vehicle and appeared "sort of indifferent" to the situation. During the interview, the Defendant agreed to provide a statement. At that time, Detective Fritts had already interviewed the victim and had heard the victim's forensic interview at Child Help. After reviewing the nude photographs of the Defendant extracted from the victim's cell phone, Detective Fritts was able to confirm that the victim's description of the Defendant's tattoos was accurate. Detective Fritts said that during this interview, the Defendant never stated that he sustained any injuries, like claw marks, to his back. After the Defendant voluntarily agreed to provide a DNA sample to the forensic unit, the interview was over, and Detective Fritts and Detective Merritt left. The Defendant's recorded statement was admitted at trial.

Detective Fritts said that he sent the victim's cell phone to the cyber investigations unit so that they could extract all information relevant to the investigation from the

phone. The forensic extraction yielded Kik messages exchanged between the victim and the Defendant and the nude photographs the Defendant had sent to the victim. Detective Fritts was later informed, following the victim's sexual assault examination, that the victim had sustained an injury during the incident. He said that because no genetic material had been recovered from the victim, no comparative DNA analysis was performed. He said that because the victim had been showered after the rape and the Defendant had not ejaculated, this could have affected the recovery of genetic material from the victim.

On July 13, 2016, Detective Fritts went to see the Defendant at Burger King, the Defendant's place of employment. He told the Defendant that there were some things they needed to talk about. He then informed the Defendant that there were no warrants for him, that he was not going to put handcuffs on him, and the he was not charging him at that point. The Defendant agreed to talk to him, and they spoke in Detective Fritts' unmarked vehicle, where the Defendant sat in the front passenger seat. Detective Fritts stated that he recorded this second interview, which was also admitted into evidence. During the interview, the Defendant said he wanted to get some water, so they both went back inside the restaurant. Shortly thereafter, the Defendant voluntarily provided a written statement, which was admitted into evidence.

Detective Fritts testified that he reviewed the messages between the Defendant and the victim on the Kik application and that the victim never solicited nude photographs from the Defendant and never said that she liked the nude photographs. He noted that although he never told the Defendant that the victim was fifteen years old, the Defendant mentioned in his July 13, 2016 written statement that he learned that the victim was fifteen after they had sex. Detective Fritts noted that the Defendant had claimed that the victim was seventeen during the first interview.

Detective Fritts said that after the Defendant gave his July 13, 2016 written statement, he interviewed West a second time, and then began working with the district attorney's office on this case. He also learned that the Defendant was twenty-two years old on January 22, 2016.

Officer Edward Wassman of the cyber investigations unit testified that he found deleted Kik messages on the victim's cell phone between the victim and the Defendant that were pertinent to the investigation. He also recovered photographs of the Defendant that were relevant to this case. Officer Wassman noted that if Facebook Messenger texts had been deleted from the victim's cell phone, then he would have been unable to find them during the extraction process.

Nan Arsenault, a nurse and an expert in the field of sexual assault examinations, testified that she performed a sexual assault examination on the victim on January 23, 2016, at the University of Tennessee Medical Center. During this examination, the victim reported that she went to West's home, drank shots prepared by West, blacked out, and awoke to the Defendant having sex with her and West using a vibrator on her or putting her fingers inside her vagina.

Nurse Arsenault described the victim's demeanor as "subdued" and on occasion, "a little teary." However, she stated that the victim was "very cooperative" and "didn't hesitate to answer questions." She also said the victim complained of "pain in her vaginal area." During the examination, Nurse Arsenault observed a large laceration extending from the victim's posterior fourchette into her peroneal area that was nearly as deep as an episiotomy. Nurse Arsenault noted that she was surprised when she observed this laceration because it was "actually a larger injury than most of the cases that [she had] done, and [the victim] was very, very uncomfortable and hurt" when she examined the area. When Nurse Arsenault swabbed this area, it began oozing, which indicated that the laceration was recent. She opined that this laceration was caused by blunt force trauma because the laceration had "jaggedness to it." Nurse Arsenault said that in her experience, any individual who sustained such an injury would withdraw from the person responsible for it.

While she acknowledged that injuries were possible with consensual sex, Nurse Arsenault said she had never seen someone with an injury like the victim's that was caused by consensual sex. She opined that the victim's injury could have been caused by a penis or a vibrator. She also said the victim's injury was not consistent with a typical fall. When asked if the victim's injury could have been caused from a fall on that specific area of the body, Nurse Arsenault acknowledged that it was a possibility but asserted that she had "rarely seen that injury" because it was "a hard place to injure directly." Nurse Arsenault said that the victim's laceration was so painful that she had to conclude the examination early. She also stated that she performed a sexual assault kit on the victim to gather any available genetic material. She explained that using a condom, bathing, showering, or douching might affect the collection of genetic material. In addition to observing the victim's vaginal laceration that required surgical repair, Nurse Arsenault also observed a small bruise on the victim's left breast.

The Defendant testified in his own behalf. He stated that his first interaction with the victim was on January 22, 2016. The Defendant said he had talked with West about "having her hook me up with one of her friends" for his birthday, and West said she had a friend from church camp. Upon learning this, the Defendant sent the victim messages on Facebook and then sent her messages and photographs through the Kik application on his cell phone. When he sent the victim Facebook messages telling the victim she was

"cute," the victim replied that he was "cute" as well, and he asked her if she wanted to send messages on the Kik application. The Defendant said he then sent the victim nude photographs of himself on Kik, and the victim responded, "[Y]um." He claimed he sent these photographs to the victim because "she was saying I was cute and told me she wanted to come over and sleep with me." When the victim asked to come over, he told the victim that it was "up to [West]" and gave the victim West's number. He said he was not aware of the victim having West's number before he gave it to her. The Defendant said West eventually agreed to the victim coming over, and he believed the victim's intent was to have sex with him because she kept saying "she wanted to come over and sleep with [him]."

The Defendant admitted that he did not ask the victim her age because West had told him that she and the victim were the same age and that they attended church camp together. He said he specifically asked West if the victim was eighteen years old before the victim came over because he did not want to get into trouble. He said he and the victim continued to exchange messages, and the victim told him that she would be on her way soon and that her father had to go pick up her brother.

The Defendant said that when the victim arrived, he went out to the living room, and West introduced the victim to him. He said West and the victim went to the kitchen and began doing shots of alcohol while he sat on the couch in the living room. He joined them in the kitchen a few minutes later. Although West was initially giving the victim shots, the victim began pouring her own shots. The Defendant acknowledged that he had been drinking throughout the day. He said West had been talking to the victim about church camp, and when he and West asked the victim, "Are you sure you're 18[?]," the victim replied that "she was 18."

The Defendant said he, West, and the victim all went into the living room and sat down on the couch where they listened to music, and then they all got up and headed toward West's bedroom. The Defendant then described what happened when they got to West's bedroom:

> [West] walked out to go to the kitchen and grab the liquor bottle and a shot glass, and that is when [the victim] was laying [sic] on the bed, and I was on the bed on my knees, and [the victim] pulled my pants down and was giving me oral sex, and then [West] walked back in and pulled [the victim's] pants down and started fingering her and using the dildo on her, and then [West] motioned me to go down on [the victim], to have sex with [the victim], and then I got on top of [the victim], started having sex with [the victim], and she was clawing my back, and that is pretty much when I

- 15 -

got up, because I was in pain 'cause of it, and then I also couldn't finish because I was also intoxicated.

The Defendant acknowledged that he penetrated the victim with his penis. He denied using the vibrator on the victim and instead asserted that West used a vibrator on the victim. He said the victim never said "stop" or "no" while he was having sex with her and never said that something hurt. He also said that the victim never blacked out or passed out while she was at West's home. He said he believed that the victim wanted to have sex with him because she had given him oral sex and because she was pushing him toward her vagina. He said he penetrated her with his penis after the victim gave him oral sex. Although he acknowledged that the victim did not ask him to penetrate her with his penis, the victim was "just motioning [him] to go down there."

After the Defendant had sex with the victim, the victim went to the bathroom to use the restroom. The Defendant then went into the bathroom to take a shower, and West walked into the bathroom a few seconds later. When the victim began vomiting in the bathtub while the Defendant was taking a shower, West told the victim that she needed to take a shower. The victim got in the shower with him and threw up on him, and he rinsed off and got out of the shower and went to his bedroom. However, when he heard a noise, the Defendant returned to the bathroom. When he got to the bathroom, he saw that the victim had fallen. He said that "[s]he was straddled like one leg over the bath tub, like where you get in and get out, and her head . . . was kind of slumped over 'cause [of] where she fell." The Defendant said West was helping the victim up after her fall, and the Defendant returned to his bedroom. The Defendant admitted that he never told detectives that the victim had fallen on the edge of the bathtub.

The Defendant stated that approximately ten minutes later, he saw West and the victim going into the bedroom belonging to West's niece. He said West had the victim lie down because she was still feeling sick, and she gave the victim a trash can because the victim had started vomiting again. He said West called the victim's mother and asked her what to do because the victim was vomiting so much, and then West left to get some water and brought it back to the victim, who was continuing to throw up. West called the victim's mother a second time. The Defendant also saw West deleting messages from the victim's phone before the victim's parents picked her up. He said the victim told him that she was fifteen years old before she left, which concerned him because they had engaged in sexual intercourse.

The Defendant admitted that he lied to Detective Fritts during his first interview because he was scared and nervous that he was going to jail. He said that he got into the detective's car for this interview because he felt like if he refused, he would have been arrested. He maintained that he did not know that the victim was underage until after

they had sex; he said he believed that the victim was eighteen because she was in West's church group. He also reiterated that the victim told him that she was eighteen in the kitchen prior to them having sex.

The Defendant said that when Detective Fritts came to the Burger King, he asked him to get in his car, and he complied but did not feel like he could refuse. He first gave a verbal statement, and then Detective Fritts asked him to give a written statement, which he provided inside the Burger King because he needed some water.

Although the Defendant acknowledged that none of the Kik messages admitted into evidence showed the victim telling him that she wanted to sleep with him, he claimed that some of the messages between the victim and him were missing. The Defendant acknowledged that the Facebook messages admitted into evidence showed that the victim never told him that she was eighteen years old and actually informed him that she was too young for him, and he replied, "[I] like young girls[.]" He said he was aware that the victim's father had to drive the victim to his and West's home. The Defendant said he was concerned that the victim would get sick because she had consumed so much alcohol. He also said he knew the victim was becoming intoxicated before he had sex with her.

The Defendant acknowledged that during his first interview, he was not handcuffed and was not taken into custody. He said he willingly gave his first statement and that Detective Fritts was calm during both of his interviews. The Defendant admitted he lied when he told Detective Fritts that he did not know that the victim was coming over to the home because he had already sent Facebook and Kik messages to the victim and had sent her nude photographs of himself. He also lied when he told Detective Fritts that he and the victim never had sex.

Following the close of all proof, the jury found the Defendant guilty on all counts as charged. Thereafter, the trial court imposed an effective sentence of fifteen years. The Defendant filed a timely motion for new trial, which was denied, and then filed a timely notice of appeal.

## ARGUMENT

**I. Motion in Limine.** The Defendant contends that the trial court erred in not granting his motion in limine to exclude the oral and written statements he provided to detectives. He claims that he was never advised of his Miranda rights prior to giving these statements and that the detectives frightened him to such an extent that he gave his statements under duress. Although the Defendant acknowledges that he was not formally "in custody" when he made these statements, he claims he provided these statements

while deprived of his freedom by the authorities in a significant way, which violates Miranda.  He notes that although the detectives were careful to tell him on both occasions that there were no warrants for his arrest and that they were merely trying to uncover "the truth," in reality, the detectives were talking to him with the goal, which they accomplished, of persuading him to incriminate himself.  He pointedly asserts that Detective Fritts "got what he wanted—a confession, and without advising [him] in any way of his right not to incriminate himself."  The State responds that the trial court properly denied the motion in limine to exclude these statements because the Defendant was not in custody at the time he provided them.  We conclude that the trial court did not err in denying the Defendant's motion in limine.

Initially, we recognize that when a defendant claims that the State has obtained a statement in violation of a constitutional right, he or she should file a pretrial motion to suppress to avoid waiving the issue.  See Tenn. R. Crim. P. 12(b)(2)(C), (c), (f); State v. Zyla, 628 S.W.2d 39, 41 (Tenn. Crim. App. 1981).  Here, because the State did not object to the late-filed motion and the trial court considered this issue on the merits, we have decided to treat this pretrial hearing as if the Defendant followed the proper procedure.  See State v. Mark Christopher Davis, No. 03C01-9601-CR-00006, 1997 WL 119550, at *3 (Tenn. Crim. App. Mar. 17, 1997).

A trial court's findings of fact at a suppression hearing are binding on an appellate court unless the evidence preponderates against them.  State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  Odom, 928 S.W.2d at 23.  The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  Id.; see Bell, 429 S.W.3d at 529.  Despite the deference given to trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness.  State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).  When evaluating the correctness of a trial court's ruling on a suppression motion, this court may consider not only the proof offered at the suppression hearing but also the evidence presented at trial.  State v. Bishop, 431 S.W.3d 22, 35 (Tenn. 2014); State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Similarly, the

Tennessee Constitution provides "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. This right against self-incrimination gives criminal defendants the right to remain silent. State v. Davidson, 509 S.W.3d 156, 191 (Tenn. 2016) (citing State v. Dotson, 450 S.W.3d 1, 52 (Tenn. 2014); State v. Freeland, 451 S.W.3d 791, 813 (Tenn. 2014); State v. Jackson, 444 S.W.3d 554, 585 (Tenn. 2014)).

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court created procedural safeguards to protect the privilege against self-incrimination. The court identified the particular circumstances under which certain warnings must be given:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Id. at 479 (footnote omitted). The Tennessee Supreme Court specifically recognized that "[b]y its own terms, Miranda applies to the questioning of an individual who has been 'taken into custody or otherwise deprived of his freedom by the authorities in any significant way.'" State v. Dailey, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting Miranda, 384 U.S. at 478). In determining whether an individual is entitled to Miranda warnings, the following test should be applied:

> [T]he relevant inquiry is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. The test is objective from the viewpoint of the suspect, and

the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question.

State v. Anderson, 937 S.W.2d 851, 852 (Tenn. 1996). A nonexclusive list of factors relevant to this objective assessment includes:

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855. "The totality of the circumstances surrounding each interrogation must be closely examined when evaluating whether an individual is in custody for purposes of Miranda." Id. This inquiry is "very fact specific." Id.

At the conclusion of the motion hearing, the trial court concluded that neither the February 8, 2016 interview nor the July 13, 2016 interview was a custodial interrogation requiring Miranda warnings. The court found that Detective Fritts provided credible testimony during the motion hearing. It also determined, after listening to the Defendant's recorded statements, that Detective Fritts' demeanor during the interviews was "nonconfrontational," "businesslike," and "straightforward." The court observed that the detectives were not "accusatory," that both interviews were short in length, and that the first interview took place at the Defendant's home while the second took place at the Defendant's work. It also recognized that the Defendant was free to leave after both interviews and that the Defendant did not seem to be "under any direct pressure." The court further recognized that during both interviews, the Defendant was told that there were no warrants for his arrest and that the detectives were there to find out what happened. Ultimately, the court held that "based upon the totality of the circumstances in this case, . . . a reasonable person in the suspect's position would have not felt deprived of their freedom of movement to a degree associated with a formal arrest."

After carefully reviewing the proof at the motion hearing and trial as well as the recorded interviews, we conclude that the trial court properly denied the motion in

limine. The February 8, 2016 interview, which took place inside the detectives' unmarked vehicle outside the Defendant's home, was at a place and time convenient to the Defendant. Prior to his interview, the Defendant saw that West was not arrested after talking with the detectives and that she was allowed to return to her home following her interview. The detectives advised the Defendant that he was not in custody, that there were no warrants for his arrest, and that they just wanted to speak to him about what happened, and the Defendant agreed to talk to them. The duration of the Defendant's interview was short, and we agree with the trial court the detectives' demeanor during their questioning of the Defendant was "nonconfrontational," "businesslike," and "straightforward." There was no limitation on the Defendant's movement, and he was not placed in handcuffs. The Defendant acknowledged that he could have exited the vehicle at any time and that the detectives never threatened to take him into custody. The detectives made it clear that they were there to find out what happened, and neither of the detectives intimated that they believed the Defendant was guilty. When the detectives and the Defendant finished talking, the Defendant exited the vehicle and returned to his home. Because these factors fully support the trial court's determination that the February 8, 2016 interview was not a custodial interrogation, the detectives were not required to provide Miranda warnings to the Defendant.

The July 13, 2016 interview, which took place inside the detectives' unmarked vehicle outside the Defendant's place of employment, was also at a place and time convenient to the Defendant. The duration of the questioning during this interview was also short, and Detective Fritts' demeanor remained "nonconfrontational," "businesslike," and "straightforward." Detective Fritts told the Defendant that he wanted to talk to him about a few things, and the Defendant agreed to speak with him. During this interview, no limitations were placed on the Defendant's movement. He was able to smoke a cigarette before getting into Detective Fritts' vehicle and was able to exit that vehicle and return to the restaurant to get something to drink before providing his written statement. The Defendant admitted that Detective Fritts did not take him into custody, arrest him, or inform him that he had to talk to him. He also admitted that it was his choice as to whether he got into Detective Fritts' vehicle. There was no evidence of any form of restraint imposed on the Defendant, and Detective Fritts never intimated that he believed the Defendant was guilty. During this interview, Detective Fritts asked the Defendant if he would provide a written statement in his own words summarizing the things he had told him, and the Defendant agreed to do this. When he finished with this statement, the Defendant returned to work. Because these factors also support the trial court's determination that the July 13, 2016 interview was not a custodial interrogation, Detective Fritts was not required to provide Miranda warnings to the Defendant.

We conclude that a reasonable person in the Defendant's position during the interviews on February 8, 2016 or July 13, 2016 would not have "consider[ed] himself or

herself deprived of freedom of movement to a degree associated with a formal arrest." Anderson, 937 S.W.2d at 855. Because neither of these interviews amounted to a custodial interrogation, the detectives were not required to give the Defendant the Miranda warnings prior to talking to him. Accordingly, the trial court did not err in denying the Defendant's motion in limine.

**II. Sufficiency of the Evidence.** The Defendant contends that the evidence was insufficient to sustain his convictions for aggravated rape, rape, statutory rape, and exhibition to a minor of obscene material, and the State counters that the proof overwhelmingly supports his convictions. We conclude that the evidence is sufficient to sustain all of the Defendant's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

**A. Aggravated Rape.** The Defendant argues that the proof is insufficient to sustain his aggravated rape conviction. While he acknowledges that the victim sustained

a vaginal laceration, he contends that the State failed to prove beyond a reasonable doubt that he caused this injury. The Defendant specifically claims Nurse Arsenault's testimony suggests that West's use of the vibrator actually caused the victim's injury. The Defendant also contends that the evidence is insufficient to sustain this conviction because the State failed to prove the helplessness of the victim. In response, the State argues that the Defendant is responsible for West's acts under the theory of criminal responsibility and that, alternatively, the Defendant caused this injury when he vaginally raped the victim. Our review of the record shows that the State never made an argument regarding criminal responsibility at trial and that the jury was never instructed on criminal responsibility. Nevertheless, we conclude that the proof is sufficient to sustain the Defendant's conviction for aggravated rape based on his own act of sexually penetrating the victim.

As relevant in this case, aggravated rape "is unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . [t]he defendant caus[ing] bodily injury to the victim[.]" T.C.A. § 39-13-502(a)(2). "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Id. § 39-11-106(a)(2).

The Defendant first argues that the State failed to prove beyond a reasonable doubt that he was the individual who caused the victim's vaginal laceration; instead, he claims that West caused this injury when she assaulted the victim with the vibrator. We note that the State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

At trial, the victim testified that she drank too much alcohol after West provided her with several shots. When the victim began feeling sick from her intoxication, she went to West's bedroom and sat down on her bed. At the time, West was the only individual in the bedroom with her. The victim said that shortly thereafter she "blacked out" and when she awoke, the Defendant was sexually penetrating her with his penis, and she heard a vibrating noise and observed West in the room. The victim said she was in pain, yelled, and heard the Defendant and West laughing together. The victim stated that she never consented to sexual intercourse with the Defendant and that if she could have stopped or prevented the Defendant from having sex with her, she would have done so. During this incident, the victim sustained a vaginal laceration that had to be surgically repaired; she also sustained two bruises on her breasts and a scratch on her chest. Nurse Arsenault testified that when she examined the victim a day after the incident, she saw

- 23 -

that the victim had sustained a deep laceration to her vagina, which was recent. Photographs admitted at trial corroborate the nurse's testimony regarding this injury. Nurse Arsenault also observed a small bruise on the victim's left breast. At trial, the Defendant admitted to vaginally penetrating the victim with his penis. In determining whether the evidence is sufficient to support a conviction, we reiterate that the jury evaluates the credibility of witnesses, determines the weight given to each witness's testimony, and reconciles all conflicts in the evidence. Campbell, 245 S.W.3d at 335. Here, the jury accredited the victim's testimony that the Defendant sexually penetrated her without her consent and also found, based on the evidence presented at trial, that the Defendant caused the bodily injury to the victim. Viewing the proof in the light most favorable to the State, we conclude that the evidence was sufficient to prove beyond a reasonable doubt that the Defendant was responsible for causing the victim's injuries.

The Defendant also asserts that the evidence is insufficient to sustain his aggravated rape conviction because the victim's "helplessness was not proven." However, the Defendant in this case was charged under (a)(2) of the aggravated rape statute. See T.C.A. § 39-13-502(a)(2). The presentment specifically charged the Defendant with "unlawfully and knowingly sexually penetrat[ing] and caus[ing] bodily injury" to the victim, and the jury was likewise instructed. See id.; 7 Tenn. Pract. Pattern Jury Instr. T.P.I.—Crim. 10.01. The record shows that the Defendant was not charged with aggravated rape under (a)(3) of the statute, which requires, in addition to unlawful sexual penetration of a victim by the defendant, that "[t]he defendant is aided or abetted by one (1) or more other persons" and either "[f]orce or coercion is used to accomplish the act" or "[t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless." See T.C.A. § 39-13-502(a)(3). Consequently, the victim's physical helplessness was not an element of the charged offense of aggravated rape. However, to the extent that the victim's physical helplessness was a necessary element of the underlying rape offense, see id. § 39-13-503(a)(3), we conclude that a rational jury could have found, beyond a reasonable doubt, that the victim was physically helpless when the Defendant sexually penetrated her, as we explain in the next section. The victim testified that she "blacked out," and when she awoke, the Defendant was sexually penetrating her, and the jury, by its verdict, accredited the testimony of the victim. Moreover, as we previously concluded, there was sufficient evidence for a rational jury to find that the Defendant's unlawful sexual penetration caused the victim's bodily injury. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for aggravated rape.

**B. Rape.** The Defendant also contends that the State failed to present sufficient proof to sustain his two rape convictions. He claims that the proof shows that the victim went to his home "fully expecting to have consensual sex with [him]" and that the State failed to adequately prove the victim's helplessness. The State responds that because the

jury chose to accredit the victim's testimony over the Defendant's on the issues of consent and her physical helplessness, the Defendant is not entitled to relief. We conclude that the evidence is sufficient to sustain both of the Defendant's rape convictions.

As charged in this case, rape is "unlawful sexual penetration of a victim by the defendant" when "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent" or when "[t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless[.]" Id. § 39-13-503(a)(2), (a)(3).

To support his claim that the victim consented to the sexual intercourse, the Defendant highlights several pieces of evidence. Specifically, he asserts that the proof showed that when he texted the victim that he wanted to have sex with her, she responded, "Yes. Maybe." He also highlights his testimony that the victim replied, "[Y]um," after he sent the nude photographs of himself to her. The Defendant emphasizes that although the victim testified his nude photographs made her feel "uncomfortable," she still wanted to go to West's home, knowing that he would be there. He says he readily admitted at trial that he engaged in sex with the victim and provided a written statement to Detective Fritts to that effect. Given this proof, the Defendant contends that he and the victim "met at Ms. West's residence, both expecting to have sex."

Although the Defendant argues the evidence established the victim's consent to the sexual penetration, we disagree. The victim testified that when she went over to West's home she was not planning on having sex with the Defendant. While she was flattered that the Defendant was flirting with her, she refused his request for her to send nude pictures of herself. The victim acknowledged that she replied, "Yes, maybe," when the Defendant told her that he wanted to have sex with her but said she responded in this way because she felt uncomfortable and did not want to upset the Defendant. When the victim arrived at West's home, she never indicated to the Defendant that she wanted to have sex with him. The victim said that she went to West's bedroom when she felt sick after consuming too much alcohol and that only West was present when she "blacked out." Later, the victim awoke to the Defendant penetrating her vagina with his penis, even though she had never consented to any sexual activity. The victim stated that she did not take off her clothes and did not consent to having her clothes removed. She said that she was in pain, yelled, and heard the Defendant and West laughing while the Defendant sexually penetrated her. Moreover, Nurse Arsenault testified that she had never seen someone with a vaginal laceration like the victim's that had been caused by consensual sex.

We recognize that the issue of consent is a jury question. Haynes v. State, 540 S.W.2d 277, 278 (Tenn. Crim. App. 1976) (citing King v. State, 357 S.W.2d 42, 46 (Tenn. 1962)). The jury, by its guilty verdict in count three, accredited the victim's testimony that she did not consent to the sexual penetration over the Defendant's testimony to the contrary. We conclude that the proof presented at trial supports the jury's finding that the victim never consented to the Defendant's sexual penetration of her. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction in count three.

We also conclude that the evidence is sufficient to support the Defendant's conviction for rape in count two, which requires proof that the Defendant knew or had reason to know that the victim was physically helpless at the time of the unlawful sexual penetration. The victim testified that she was physically helpless from consuming too much alcohol, which caused her to "black out." She said that if she could have stopped or prevented the Defendant from having sex with her that night, she would have done so. J.G., the victim's father, testified that when he picked her up from West's home, the victim's voice was "shaky and distorted." He said the victim smelled of alcohol, could not sit upright, and could not keep her eyes open. Nurse Arsenault testified that any individual sustaining a vaginal laceration like the victim's would withdraw from the person responsible for causing this injury. The Defendant admitted that he was concerned the victim would get sick because she had consumed so much alcohol and that he knew the victim was very intoxicated before he had sex with her. We conclude that this proof supports the jury's finding that the Defendant knew the victim was physically helpless at the time that the unlawful sexual penetration occurred. Accordingly, we conclude that the proof is also sufficient to support the Defendant's conviction for rape in count two.

**C. Statutory Rape.** The Defendant asserts that the State presented insufficient evidence to support his statutory rape conviction. He admits that he sexually penetrated the victim when the victim was fifteen years old and he was twenty-two years old; however, he claims that the victim lied about her age and that he did not discover that the victim was underage until after they had sex. The Defendant asserts that his testimony at trial, that he asked the victim if she was eighteen years of age prior to them having sex, and she replied affirmatively, was uncontradicted. The State contends that no proof was presented corroborating the Defendant's claim that the victim lied to him about her age and that the proof overwhelmingly establishes that the Defendant knew the victim was a minor at the time he had sexual intercourse with her. We conclude that the proof is sufficient to sustain the Defendant's conviction for statutory rape.

As relevant in this case, statutory rape is "the unlawful sexual penetration of a victim by the defendant . . . when . . . [t]he victim is at least fifteen (15) but less than

eighteen (18) years of age and the defendant is more than five (5) but less than ten (10) years older than the victim." T.C.A. § 39-13-506(b)(2). Sexual penetration is defined as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body[.]" Id. § 39-13-501(7).

The State presented proof at trial showing that the victim was fifteen years old and that the Defendant was twenty-two years old on January 22, 2016, the date that the unlawful sexual penetration occurred. The victim testified that after the Defendant contacted her several times on Facebook Messenger, she informed the Defendant that she was "a lil young" for him, and the Defendant replied "Nope lol" and continued to message her. Later that day, the Defendant messaged her, "ill [sic] be 23 on Saturday and I like young girls." At the time that the unlawful sexual penetration occurred, the Defendant had seen the photographs posted by the victim on Facebook, which he acknowledged indicated that she was young. The Defendant also knew that the victim had depended on her father to drive her to West's home. No proof was presented corroborating the Defendant's claim that the victim lied to him about her age. Instead, the overwhelming evidence presented at trial showed that the Defendant knew the victim was a minor when he sexually penetrated her. The jury, by its verdict, chose not to accredit the Defendant's testimony that the victim had lied to him about her age, as was its prerogative. Consequently, we conclude that the evidence is sufficient for a rational trier of fact to find, beyond a reasonable doubt, that the Defendant was guilty of statutory rape.

**D. Exhibition of Obscene Material to a Minor.** Lastly, the Defendant argues that the proof is insufficient to sustain his conviction for exhibiting obscene material to a minor. Although he admits he sent nude photographs of himself to the minor victim, he claims he was not aware that the victim was a minor at the time that he sent these photographs to her. The State counters that when the victim told the Defendant that she was too young for him, the Defendant replied that he liked "young girls" and then sent her nude photographs of himself. We conclude that the evidence is sufficient to support this conviction.

Exhibition of material harmful to a minor is codified in Tennessee Code Annotated section 39-17-911, which states in pertinent part:

(a) It is unlawful for any person to knowingly sell or loan for monetary consideration or otherwise exhibit or make available to a minor:

(1) Any picture, photograph, drawing, sculpture, motion picture film, video game, computer software game, or similar visual representation or image of

- 27 -

a person or portion of the human body, that depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and that is harmful to minors[.]

Id. § 39-17-911(a)(1). Code section 39-17-901(6) defines the term "harmful to minors":

"Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:

(A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

(C) Taken as whole lacks serious literary, artistic, political or scientific values for minors[.]

Id. § 39-17-901(6).

To reiterate, the evidence established that when the Defendant contacted the victim on Facebook Messenger and told her that she was cute, the victim informed the Defendant that she was "a lil young" for him, and the Defendant replied "Nope lol" and continued to message her. The Defendant then messaged the victim, "ill be 23 on Saturday and i like young girls" before sending photographs of his penis to the victim. No proof corroborates the Defendant's claim that he was not aware the victim was a minor at the time that he sent these photographs to her. Based on the Facebook Messenger texts admitted at trial, the Defendant never confirmed that the victim was at least eighteen years old before sending these pictures. Because the proof fully supports the jury's finding that the Defendant knew the victim was a minor at the time he sent the nude photographs, he is not entitled to relief.

## CONCLUSION

Based upon the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE